Johnida W. BARNES, Plaintiff–Appellee,

v.

Byron R. WINCHELL, Defendant–Appellant.

No. 95–4008.

United States Court of Appeals, Sixth Circuit.

Feb. 3, 1997.

David L. Day (argued and briefed), Columbus, OH, for Plaintiff-Appellee.

George D. Jonson, Elizabeth A. McCord (argued and briefed), Montgomery, Rennie & Jonson, Cincinnati, OH, for Defendant-Appellant.

Before NELSON, MOORE, and COLE, Circuit Judges.

MOORE, Circuit Judge.

This appeal addresses whether absolute judicial immunity extends to actions taken by a state judge that were allegedly prosecutorial in nature. Defendant-Appellant, former Ohio Municipal Court Judge Byron R. Winchell, appeals the district court's denial of his motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis of his absolute judicial immunity in this 42 U.S.C. § 1983 damages action brought by Plaintiff-Appellee Johnida Barnes. Ms. Barnes alleges that Judge Winchell violated her constitutional rights and acted without jurisdiction in a nonjudicial capacity by assisting in the initiation of and maliciously continuing criminal prosecutions against her. For the reasons that follow, we hold that Judge Winchell is absolutely immune from suit for the complained-of actions and therefore reverse the district court's order.

## I. BACKGROUND

Ms. Barnes's complaint alleges that, at all times pertinent to this action, Byron R. Winchell served as a judge of the Municipal Court of Chillicothe, Ross County, Ohio. On March 30, 1993, Scott A. Barnes and Carolyn Barnes, Scott's first wife, each filed a criminal complaint against Johnida W. Barnes, Scott's second, but at the time estranged, wife. Each complaint charged menacing by stalking, a first-degree misdemeanor in violation of OHIO REV.CODE ANN. § 2903.211 (Banks–Baldwin West 1996). Compl. ¶ 11. The law director for the City of Chillicothe had previously authorized Scott and Carolyn to file complaints against Johnida Barnes for criminal trespass in violation of OHIO REV. CODE ANN. § 2911.21 (Banks–Baldwin West 1996), a fourth-degree misdemeanor. Compl. ¶ 12. When Scott and Carolyn came before Judge Winchell, the judge directed that the charges against Ms. Barnes be "changed to allege that [Johnida Barnes] was engaged in a pattern of conduct knowingly causing ... Scott A. Barnes and Carolyn Barnes to believe that [she] would cause physical harm or distress" to them in violation of OHIO REV. CODE ANN. § 2903.211 (Banks–Baldwin West 1996), menacing by stalking. Compl. ¶ 13. According to Ms. Barnes, Judge Winchell thereafter "prepared or assisted in the preparation of one or both of the complaints" against her, and he notarized Carolyn's complaint. Compl. ¶ 14. Ms. Barnes was subsequently arrested.

In June of 1993, at a scheduled pretrial, the Chillicothe prosecutor determined that the criminal cases against Ms. Barnes should be dismissed as frivolous. Compl. ¶ 16. Nonetheless, Ms. Barnes asserts that Judge Winchell, the presiding judge, refused to dismiss the charges against her and maliciously continued to prosecute her. *Id.* On July 10, 1993, Ross County Probate Judge Gerald Ratcliffe removed Judge Winchell from the cases because Judge Winchell appeared to be biased against Ms. Barnes and because he acted as a prosecutor. Compl. ¶ 17. Four days later, the charges against Ms. Barnes were dismissed. Compl. ¶ 18.

On July 5, 1994, Ms. Barnes filed a civil action in U.S. district court against Judge Winchell, Scott Barnes, and Carolyn Barnes, alleging, inter alia, that Judge Winchell's actions subjected her to the deprivation of rights, privileges, and/or immunities secured by the Constitution and laws of the United States, and 42 U.S.C. § 1983, including the "right to be free of arrest and prosecution and to due process of law." Compl. ¶ 25. Judge Winchell moved to dismiss all claims against him on the basis of absolute judicial immunity. On August 9, 1995, the district court dismissed all claims against Scott Barnes and Carolyn Barnes, but denied Judge Winchell's motion to dismiss. The sole issue on appeal is whether Judge Winchell is entitled to absolute judicial immunity from Ms. Barnes's § 1983 suit.

## II. ABSOLUTE JUDICIAL IMMUNITY ANALYSIS

### A. Jurisdiction and Standard of Review

■ As a threshold matter, we must consider our jurisdiction to review this interlocutory appeal. The Supreme Court has held that a district court's denial of a claim of immunity, to the extent that it turns on an issue of law, is immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 525, 530, 105 S.Ct. 2806, 2814–15, 2817–18, 86 L.Ed.2d 411 (1985) (absolute and qualified immunity); *Nixon v. Fitzgerald*, 457 U.S. 731, 743, 102 S.Ct. 2690, 2697–98, 73 L.Ed.2d 349 (1982) (absolute presidential immunity); *see also Archie v. Lanier*, 95 F.3d 438, 442 (6th Cir. 1996) (recognizing that "a defendant in a section 1983 case has an absolute right immediately to appeal a denial of immunity"). As the Supreme Court reasoned, "the denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." *Mitchell*, 472 U.S. at 525, 105 S.Ct. at 2815.

Recently, the Supreme Court elaborated on the appealability of denials of immunity in *Johnson v. Jones*, — U.S. —, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995): "a defendant, entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at —, 115 S.Ct. at 2159. *Johnson*, however, reaffirms *Mitchell*'s holding that orders denying immunity are immediately appealable to the extent that they concern "abstract issues of law" rather than determinations about factual disputes. *Id.* at —, 115 S.Ct. at 2158.

An argument can be made that the present action is superficially similar to *Johnson*. In denying Judge Winchell's motion to dismiss, the district court appears to base its decision on the presence of unsettled factual questions: "In this case, the complaint describes a scenario in which Judge Winchell may have departed from his judicial function. Only by thorough discovery will we answer this question." Dist. Ct. Op. at 7. We do not, however, interpret such language as a finding that genuine factual disputes exist which implicate *Johnson*'s jurisdictional bar because of the crucial distinguishing feature here, namely, the procedural posture of this case. The present action came before the district court, as it comes before us, not on a motion for summary judgment but on a motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6). Accordingly, there cannot be any disputed questions of fact at this stage; the district court and this court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993); *see also Wood v. Tompkins*, 33 F.3d 600, 604 (6th Cir.1994) (recognizing that appellate court reviewing district court's denial of Rule 12(b)(6) motion is without authority to review disputed questions of fact; review is limited to questions of law). Thus, despite the language of the district court's order, we conclude that we have jurisdiction to review the denial of Judge Winchell's motion to dismiss on the basis of absolute judicial immunity because our review solely involves applying principles of law to a given and assumed set of facts. *See Mitchell*, 472 U.S. at 528 n. 9,

105 S.Ct. at 2816 n. 9 (stating that in that case "the appealable [immunity] issue is a purely legal one: whether the facts alleged ... support a claim of violation of clearly established law."); *Dickerson v. McClellan*, 101 F.3d 1151, 1156–1157 (6th Cir.1996) (concluding that where the facts giving rise to a claim of qualified immunity are undisputed, regardless of the district court's reasons for denying immunity, this court could exercise jurisdiction over the appeal to the extent that it raised questions of law).

■ Because the availability of absolute judicial immunity here in the context of a Rule 12(b)(6) motion to dismiss presents a question of law, our review is de novo. *Archie*, 95 F.3d at 440. As the proponent of the claim of absolute judicial immunity, Judge Winchell bears the burden of showing that such immunity is warranted. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432, 113 S.Ct. 2167, 2169–70, 124 L.Ed.2d 391 (1993).

### B. Absolute Judicial Immunity[1]

It is a well-entrenched principle in our system of jurisprudence that judges are generally absolutely immune from civil suits for money damages. *Mireles v. Waco*, 502 U.S. 9, 9, 112 S.Ct. 286, 287, 116 L.Ed.2d 9 (1991); *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872). Immunity from a § 1983 suit for money damages is no exception. *See Pierson*, 386 U.S. at 554, 87 S.Ct. at 1217–18. The doctrine of judicial immunity is justified "by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability." *Antoine*, 508 U.S. at 435, 113 S.Ct. at 2171. Thus, compelling public benefits outweigh the "unfairness and injustice to a litigant [that] may result on occasion, [because] 'it is

a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.'" *Mireles*, 502 U.S. at 10, 112 S.Ct. at 287 (quoting *Bradley*, 80 U.S. (13 Wall.) at 347). If it were otherwise and judges were personally liable for erroneous decisions, then "the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits." *Forrester*, 484 U.S. at 226–27, 108 S.Ct. at 544.

In view of the Supreme Court's longstanding and emphatic recognition of the underlying justifications of the doctrine of absolute judicial immunity, it is not surprising that the doctrine has protected a sweeping range of judicial actions. *See, e.g., Mireles*, 502 U.S. at 12, 13, 112 S.Ct. at 288, 288–89 (concluding that judge was immune from liability for allegedly authorizing police officers to use excessive force to hale an attorney into his courtroom); *Ashelman v. Pope*, 793 F.2d 1072 (9th Cir.1986) (extending absolute judicial immunity to a judge who allegedly conspired with a prosecutor to predetermine the outcome of a proceeding); *King v. Myers*, 973 F.2d 354 (4th Cir.1992) (holding that magistrate judge was absolutely immune from civil liability for directing a police officer to effect warrantless arrest); *Green v. Maraio*, 722 F.2d 1013 (2d Cir.1983) (recognizing immunity where a judge instructed a court reporter to alter a trial transcript). In fact, the Supreme Court explicitly stated that "[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority," nor "if his exercise of authority is flawed by the commission of grave procedural errors." *Stump*, 435 U.S. at 356, 359, 98 S.Ct. at 1105, 1106.

Absolute judicial immunity is overcome only in two situations:

1. Because we are asked to review solely the availability of absolute judicial immunity, *see* Appellant's Br. at 6, we need not discuss legal principles governing the availability of qualified immunity, which in certain situations shields

public officials, including judges, from civil liability. *See generally Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir.1994) (applying both absolute and qualified immunity principles to a judge's actions).

First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction.

*Mireles,* 502 U.S. at 11–12, 112 S.Ct. at 288 (internal citations omitted); *see also Mann v. Conlin,* 22 F.3d 100, 103 (6th Cir.) (same), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 126 (1994). In the instant action, Ms. Barnes asserts that both circumstances were present to penetrate Judge Winchell's shield of absolute judicial immunity.

### C. Judicial Capacity

Absolute judicial immunity attaches only to actions undertaken in a judicial capacity. *See Forrester,* 484 U.S. at 227–29, 108 S.Ct. at 544–45. Whether an act is judicial depends on "the 'nature' and 'function' of the act, not the 'act' itself." *Mireles,* 502 U.S. at 13, 112 S.Ct. at 288 (quoting *Stump,* 435 U.S. at 362, 98 S.Ct. at 1107–08). Typically, this functional analysis turns on two factors: (1) looking to the nature of the act itself, whether the act is a "function normally performed by a judge"; and (2) regarding the expectations of the parties, whether the parties "dealt with the judge in his judicial capacity." *Id.* at 12, 112 S.Ct. at 288 (quoting *Stump,* 435 U.S. at 362, 98 S.Ct. at 1107). Yet, "if only the particular act in question were to be scrutinized," then the *Stump* formulation would broadly envelop "any mistake of a judge in excess of his authority," thereby undermining the purposes behind absolute judicial immunity. *Id.* Recognizing this concern, the *Mireles* Court reformulated the relevant inquiry: even if a particular act is not a function normally performed by a judge, we are directed to "look to the particular act's relation to a general function normally performed by a judge." *Id.* at 13, 112 S.Ct. at 288–89.

In examining the functions normally performed by a judge, courts have found that "paradigmatic judicial acts" are those that involve "resolving disputes between parties who have invoked the jurisdiction of a court." *Forrester,* 484 U.S. at 227, 108 S.Ct. at 544; *see also Antoine,* 508 U.S. at 435–36, 113 S.Ct. at 2171 (recognizing that the "touchstone" for judicial immunity has been the "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." (quotation omitted)). Moreover, this court has stated that whenever an action taken by a judge is not an adjudication between parties, it is less likely that the action will be deemed judicial. *Cameron,* 38 F.3d at 271. However, "the informal and *ex parte* nature of a proceeding has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character." *Forrester,* 484 U.S. at 227, 108 S.Ct. at 544. With this framework in mind, we examine those cases that have considered whether actions alleged to have been prosecutorial were undertaken in a judge's judicial capacity.

### D. Judicial versus Prosecutorial Actions

The gravamen of Ms. Barnes's allegations is that Judge Winchell acted as a prosecutor, rather than in a judicial capacity. The Supreme Court has yet precisely to delineate between prosecutorial and judicial acts in the judicial immunity context, but a developing line of lower court precedent has attempted to do so. In *Sevier v. Turner,* 742 F.2d 262 (6th Cir.1984), this court held that initiating accusatory processes such as criminal prosecutions is not a function normally performed by a judicial officer. *Id.* at 272. In *Sevier,* Judge Kenneth Turner, a Tennessee Juvenile Court judge under contract with the county to collect overdue child support payments, allegedly instructed his staff members "to initiate criminal prosecutions against fathers who [were] in arrears on their payments" and to use the impending prosecutions "as leverage to extract signatures on consent orders." *Id.* Judge Turner, with the aid of his referee, then initiated civil contempt proceedings against overdue fathers, who were subsequently either incarcerated or required to make payments purging their contempts. *Id.* In addition, Judge Turner received part of his salary from these payments. *Id.* Applying judicial immunity principles to these actions, this court held that:

> [The judge's] involvement in initiating both the criminal prosecution and the civil con-

tempt proceeding against Sevier, if proven, would constitute nonjudicial acts exposing [him] to liability for resulting damages. The test to be applied is whether initiating accusatory processes such as criminal prosecutions or civil contempt proceedings is a function normally performed by a judicial officer. *Stump,* 435 U.S. at 362, 98 S.Ct. at 1107. We conclude that it is not. *Id.*

In *Lopez v. Vanderwater,* 620 F.2d 1229 (7th Cir.), *cert. denied,* 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980), a case relied upon by this court in *Sevier,* the Seventh Circuit held that Illinois Circuit Court Judge William Vanderwater was not entitled to judicial immunity for his acts that were prosecutorial in nature. *Id.* at 1235. Ostensibly as a separate occupation from his judicial responsibilities, Judge Vanderwater also managed an apartment building. When Flor Lopez, a former evicted tenant, returned to the building, Judge Vanderwater went to the building armed with a handgun and detained Lopez until the police arrived. *Id.* at 1231–32. At Judge Vanderwater's request, the police arrested Lopez for criminal trespass, searched him, and took him to the police station, which was housed in the same building as the Aurora Branch Court. Judge Vanderwater, who was assigned to sit in the Geneva Branch rather than Aurora Branch, opened up the courtroom, drafted a charging document alleging theft of a key, directed his business partner to sign a blank complaint form, certified that the complaint form had been sworn, signed an arrest warrant, and, allegedly, forged a guilty plea and waiver of trial form. The next day Judge Vanderwater directed personnel in the State's Attorney's office to fill in the blank complaint form. *Id.* at 1231–33, 1235. Thus, Judge Vanderwater essentially filed charges against, arraigned, convicted, and sentenced Lopez without the assistance of a prosecutor, a defense attorney, a court reporter, or a court clerk. Even so, the Seventh Circuit concluded that Judge Vanderwater was absolutely immune from liability for the irregular, but judicial, acts involved in arraigning, convicting, and sentencing, "outrageous as they were." *Id.* at 1234. However, the judge was not entitled to immunity for making the decision to pros-

ecute, determining the offense to be charged, preparing the written charge, causing another to sign the blank complaint form and later directing its completion, preparing the guilty plea and waiver form, and presenting the charge and plea form to himself, as those actions were prosecutorial. *Id.* at 1235.

Similar to this court in *Sevier* and the Seventh Circuit in *Lopez,* the Fifth Circuit refused to recognize judicial immunity for a judge who allegedly jailed his friend's former husband when the ex-husband entered the judge's chambers on nonofficial business. *Harper v. Merckle,* 638 F.2d 848 (5th Cir.), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). Jack Harper entered the chambers of Arden Merckle, a county judge, to drop off a support payment check for his former wife, a secretary employed by another county judge in an adjacent office. *Id.* at 850. After engaging in small talk with Harper, Judge Merckle asked Harper to be sworn in for questioning. *Id.* at 851. Harper refused, walked out of the courthouse, and soon found himself being chased by court bailiffs. The bailiffs apprehended him and brought him back to the judge's chambers. *Id.* at 851–52. In chambers, Judge Merckle then held a "contempt proceeding," found Harper in contempt, and ordered Harper into custody, whereupon Harper spent three days in jail. *Id.* at 853–54. The Fifth Circuit concluded that the judge's actions were nonjudicial in part because Harper had not entertained the expectation that judicial matters were at hand when he entered the judge's chambers on nonofficial business. *Id.* at 859. However, the *Harper* court cautioned:

[O]ur holding is exceedingly narrow and is tailored to this, the rarest of factual settings.... [W]e hold only that when it is beyond reasonable dispute that a judge has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives, and it further appears certain that no party has invoked the judicial machinery for any purpose at all, then the judge's actions do not amount to "judicial acts."

*Id.* (footnote omitted).

After *Harper,* the Fifth Circuit again addressed the division between prosecutorial

and judicial actions in *Malina v. Gonzales,* 994 F.2d 1121 (5th Cir.1993), holding that a state judge who assumed the role of peace officer and prosecutor could not be protected by absolute judicial immunity because his acts were nonjudicial. *Id.* at 1124; *but cf. Brandley v. Keeshan,* 64 F.3d 196, 201 (5th Cir.1995) (holding that state trial court judge retained judicial immunity despite accompanying prosecutor to city dump to retrieve evidence), *cert. denied,* —— U.S. ——, 116 S.Ct. 947, 133 L.Ed.2d 872 (1996). After Thomas Malina passed to the right of a slow moving vehicle driven by Judge Douglas Gonzales, honked his horn at Gonzales, and motioned to Gonzales to switch lanes, the judge placed a flashing red light on his dashboard, pursued Malina's vehicle, and demanded that Malina produce his driver's license. *Id.* at 1123. Later, Judge Gonzales sent a police officer to Malina's home to instruct Malina to appear in his courtroom the next day. *Id.* When Malina appeared, the courtroom was closed, but Judge Gonzales charged him with several criminal offenses and held him in contempt. *Id.* The Fifth Circuit concluded that, aside from the contempt citation and sentencing, Judge Gonzales's acts were nonjudicial. "Peace officers, not judges, stop motorists on the highway, and prosecutors, not judges, set the judicial machinery in motion by charging someone with a crime." *Id.* at 1124.

Conversely, in *Harris v. Deveaux,* 780 F.2d 911 (11th Cir.1986), the Eleventh Circuit held that a judge did not lose immunity by directing the entry of charges against a witness who appeared before the judge in a pending case. Municipal Court Judge Clinton Deveaux presided over a preliminary hearing against Phillip Jones, who had been charged with rape and false imprisonment. During the hearing, evidence came to light that the victim, Stephanie Harris, had robbed Jones. *Id.* at 912. Despite the prosecutor's objection, the judge insisted that Harris be charged with armed robbery and ordered a detective to arrest her. After Harris was detained, Judge Deveaux indicated that he would release Harris on her own recognizance only if the prosecutor would agree to the same reduction for Jones. The prosecutor refused and ultimately another judge per-

mitted Harris to be released on her own recognizance. When Harris later appeared before Judge Deveaux and he learned she had been released, Judge Deveaux reduced the charge against Jones to aggravated assault and released Jones on his own recognizance. *Id.* The Eleventh Circuit stated:

> Judge Deveaux himself ordered the charges against Harris. We do not believe, and Judge Deveaux does not argue, that it is normally the task of a judge to file criminal charges in his own court. It seems particularly unusual for a judge to file charges over the objections of the prosecutor and investigating officer, and then conduct a preliminary hearing on whether the charges are supported by sufficient evidence to bind the defendant over for trial.

*Id.* at 914. Nevertheless, the *Harris* court concluded that the actions at issue, though "particularly unusual," were judicial. *Id.* at 915. The court distinguished *Sevier* and *Lopez* because "[t]he judges in both cases initiated charges not as a result of a case brought before them by the parties, but as a result of events in their private, nonjudicial lives, events in which they had a personal stake." *Id.* Judge Deveaux's actions, on the other hand, "arose out of judicial proceedings brought before him by independent parties." *Id.* Even though Judge Deveaux "may have acted improperly in ordering the charges against Harris," the Eleventh Circuit could not say "that he was not acting in his judicial capacity." *Id.* at 916.

■ The decisions in *Sevier, Lopez, Harper, Malina,* and *Harris* reveal a common theme: despite its breadth, the doctrine of absolute judicial immunity does not protect a judge performing the purely prosecutorial functions involved in initiating criminal prosecutions. This is especially true where the judge initiates criminal prosecutions based on the judge's private interests, completely separate from cases brought to court independently by the parties. Nonetheless, this exception to absolute judicial immunity when a judge engages in purely prosecutorial functions is narrow. *See Adams v. McIlhany,* 764 F.2d 294, 297 n. 1 (5th Cir.1985) (stating that exceptions to absolute judicial

immunity "should be as narrowly construed as reasonably possible"), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986); *Harper,* 638 F.2d at 859 (emphasizing that its holding is "exceedingly narrow"). Moreover, even if a judge encroaches upon prosecutorial functions, the broad shield of absolute judicial immunity is not automatically overcome. As demonstrated in *Harris,* a judge can still be acting in a judicial capacity for immunity purposes when undertaking seemingly prosecutorial functions in a case brought before the judge independently by the parties. Thus, the protection afforded by absolute judicial immunity is not foreclosed when an action, even if prosecutorial in nature, relates to a function normally performed by a judge or where the parties are dealing with the judge in his judicial capacity. *See Mireles,* 502 U.S. at 12–13, 112 S.Ct. at 288–89.

The district court deemed this case comparable to *Lopez* and, consequently, found that judicial immunity was unwarranted at this juncture of the case. We disagree. Judge Winchell's level of involvement in the prosecutions of Ms. Barnes is far less substantial and of a significantly different nature than the purely prosecutorial actions to which immunity did not extend in the cases recounted above. In *Sevier, Lopez, Harper,* and *Malina,* the judges, patently motivated by private interests and without involving a prosecutor, initiated criminal charges against persons who did not have any case then pending before the judges, and then, in highly irregular proceedings, passed judgment upon such charges. In stark contrast, Judge Winchell did not cause criminal charges that would otherwise not be brought to be levied against Ms. Barnes. The criminal allegations against Ms. Barnes did not belong to Judge Winchell; rather, they belonged to Scott and Carolyn Barnes. *Compare Lopez,* 620 F.2d at 1235 (recognizing that the judge "himself was, in substance if not in form, the complainant"). Here, it was Scott and Carolyn Barnes who, with prior authority from the city law director, invoked the jurisdiction of the Chillicothe Municipal Court, thereby setting the judicial machinery in motion. Therefore, unlike *Lopez* and the other cases denying immunity protection, Judge Win-

chell's conduct is more akin to the judge in *Harris* who presided, albeit erroneously, over judicial proceedings brought before him by independent parties. Guided by the reasoning in *Harris* and following *Mireles*'s directive, we must consider whether the conduct alleged in Ms. Barnes's complaint, even if seemingly prosecutorial in nature, relates to a function normally performed by a judge.

### E. Allegations of Prosecutorial Actions by Judge Winchell

Ms. Barnes specifies four distinct actions by Judge Winchell that she claims were prosecutorial in nature and taken in the absence of all jurisdiction. After Scott and Carolyn Barnes came before Judge Winchell, the judge: (1) "directed that the charges against plaintiff be changed" to allege menacing by stalking, Compl. ¶ 13; (2) notarized Carolyn's complaint, Compl. ¶ 14; (3) "prepared or assisted in the preparation of one or both of the complaints," Compl. ¶ 14; and (4) maliciously refused to dismiss the complaints after the prosecutor determined they were frivolous. Compl. ¶ 16. We examine each of these allegations of prosecutorial conduct by Judge Winchell in light of the legal principles enunciated above.

First, Ms. Barnes alleges that Judge Winchell directed Scott and Carolyn to change the charges in their criminal complaints. Ms. Barnes's complaint states that the complaints actually filed charged Ms. Barnes with menacing by stalking, whereas the law director only authorized Scott and Carolyn to file charges of criminal trespass. Under Ohio law, a complaint may be amended by the court "at any time before, during, or after a trial" to correct "any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." OHIO R.CRIM. P. 7(D); *see also* OHIO REV.CODE ANN. § 2941.35 (Banks–Baldwin West 1996) (applying laws for amending indictments to misdemeanor affidavits). Thus, although Judge Winchell was empowered to correct certain flaws in the complaints, his directive that the charges in the complaints be changed to allege a more serious misdemeanor offense might

very well have been erroneous under Ohio law.[2] *Cf. City of Hamilton v. Petty,* 33 Ohio App.2d 194, 293 N.E.2d 881, 883 (1972) (holding that municipal court judge erred by changing charge to trespassing after trial began but before first witness had finished testifying where the filed complaint, signed by arresting officer, charged the defendant with violating a city ordinance prohibiting the use of fighting words). However, absolute judicial immunity extends to a judge who, in exercising his or her authority, commits "grave procedural errors." *Stump,* 435 U.S. at 359, 98 S.Ct. at 1106. We decline to classify Judge Winchell's directive to change the charges in the misdemeanor complaints as extending beyond the characterization of at most "grave procedural error." With relative ease a reviewing court would likely be able to remedy this type of procedural error.

■ As to Judge Winchell's notarization of Carolyn's complaint, *see* Compl. ¶ 14, to commence a criminal prosecution in Ohio, Ohio law requires that the charging complaint "shall be made upon oath before any person authorized by law to administer oaths." OHIO R.CRIM. P. 3. A municipal court judge is specifically authorized to administer oaths. OHIO REV.CODE ANN. § 1901.14(A)(1) (Banks–Baldwin West 1996). By statute, "notarial acts" are defined as including "the administration of oaths and affirmations, taking proof of execution and acknowledgment of instruments, and attesting documents." OHIO REV.CODE ANN. § 147.51 (Banks–Baldwin West 1996). Furthermore, Ohio law recognizes and gives full effect within the state to notarial acts performed outside the state by a judge of any court of record in the place of performance. *Id.* Thus, the act of notarizing, although perhaps not ordinarily performed by a judge in Ohio, is related to a judge's general function of administering oaths and would be proper if done by a judge from another state. The notarization here

falls within the scope of a judicial act as broadly delineated in *Mireles.*

■ Ms. Barnes further alleges that Judge Winchell prepared or assisted in the preparation of one or both complaints. Compl. ¶ 14. It is this allegation that gives us the most pause. On the surface, preparing a complaint seems a function customarily performed by the city law director or other prosecuting authority. *See* OHIO REV.CODE ANN. § 1901.34 (Banks–Baldwin West 1996) (stating that city director of law shall prosecute all criminal cases brought before Ohio municipal court). However, Ohio's criminal framework leaves room for one citizen, seeking to accuse another of a crime, to come before a judge: "[I]n order to cause the arrest or prosecution of a person ... a peace officer, or a private citizen having knowledge of the facts, shall file with the judge or clerk ... an affidavit charging the offense committed, or shall file such affidavit with the prosecuting attorney ..." OHIO REV.CODE ANN. § 2935.09 (Banks–Baldwin West 1996). Although the parties have not pointed to any binding authority specifically addressing the propriety of a municipal court judge's assistance in preparing the charging document, appellant has directed our attention to an Ohio Attorney General Opinion discussing the role of county court judges in the preparation of affidavits for misdemeanor cases. Specifically, we note the following language:

> Assuming that a proper party for filing an affidavit is before the court, it would seem that that person probably has the primary responsibility for its preparation; however, it has long been accepted practice for the magistrate to aid in this preparation by furnishing a proper form, and in many cases actually typing or writing such affidavit for the complaining party.... [T]here would appear to be no legal reason why the affidavit itself could also not be prepared by the magistrate.... [T]here is nothing in Chapters 1907. to 1923., Re-

---

**2.** We recognize that the complaints, as filed, both alleged a stalking charge, Compl. ¶ 11, so that classifying Judge Winchell's behavior as "amending" the complaints may not be technically accurate. However, the parties have not pointed to any other sources of Ohio law on this issue, and our survey of Ohio law leads us to conclude that

"amending" the complaints is sufficiently analogous to "direct[ing] that the charges against plaintiff be changed to allege" stalking, Compl. ¶ 13, for our review of whether, for absolute judicial immunity purposes, the act is related to a general judicial function.

vised Code, to prohibit the county court judge from furnishing any necessary assistance in the preparation of said affidavit. Ohio Op. Atty. Gen. No. 3153 (1958). Although such language is hardly conclusive for our purposes, it does show the close association that a county court judge may have to the preparation of a charging document. We conclude that although it is once again asserted that Judge Winchell exceeded his proper boundaries, the assistance rendered to the complainants here relates to the general duty of a municipal court judge to receive the charging document in a misdemeanor action. Thus, Judge Winchell's assistance to Scott and Carolyn in preparing one or both of their complaints falls within the contours of a judicial act for immunity purposes.

██ Finally, Ms. Barnes asserts that Judge Winchell stepped outside his judicial capacity by maliciously refusing to dismiss the criminal complaints against her after the prosecutor deemed them frivolous. Compl. ¶ 16. Although a judge often defers to the prosecuting attorney's opinion on the sagacity of continuing prosecution, such deference is not mandatory. Under OHIO R.CRIM. P. 48(A), the prosecutor must seek leave of court to dismiss a complaint, and the trial court is granted "wide discretion in such matters." *See City of Columbus v. Stires,* 9 Ohio App.2d 315, 224 N.E.2d 369, 371 (1967). By way of analogy, the Supreme Court has similarly concluded that the current version of FED.R.CRIM.P. 48, which is substantially similar to Ohio's rule, "obviously vest[s] some discretion in the court." *Rinaldi v. United States,* 434 U.S. 22, 29 n. 15, 98 S.Ct. 81, 85 n. 15, 54 L.Ed.2d 207 (1977). Observing that the phrase "by leave of court" was specifically added to the original draft that called for automatic dismissal upon a government motion, Justice Rehnquist interpreted the addition as seemingly "clearly directed toward an independent judicial assessment of the public interest in dismissing the indictment." *Id.* at 34, 98 S.Ct. at 87 (Rehnquist, J., dissenting from summary disposition). Therefore, because the decision of whether to grant leave to dismiss involves assessing the public interest, it implicates the doctrine of absolute judicial immunity's paramount concern, fearless and independent decisionmaking. The exercise of this type of judicial discretion thus comprises a quintessential judicial act furthering the resolution of a dispute between parties. *See Forrester,* 484 U.S. at 227, 108 S.Ct. at 544.

Adhering to *Mireles*'s directive to look to the general function of the actions at issue, upon review we believe that the actions that Judge Winchell undertook were all related to general judicial functions involved in presiding over cases brought before him independently by the parties. These were not actions unrelated to his judicial role that simply happened to have been undertaken by a judge. Similar to the Eleventh Circuit in *Harris,* we cannot say with assured confidence that the conduct alleged in Ms. Barnes's complaint overstepped judicial functioning such that Judge Winchell was not acting in his judicial capacity. Assuming Judge Winchell committed procedural errors, even "grave" ones, his actions are not rendered any less judicial for absolute judicial immunity purposes. *See Cameron,* 38 F.3d at 272 (reasoning that "[a]lthough the particular incident involved here [a probate court judge not addressing a probate court employee directly, barring that employee from his courtroom, reassigning the employee's cases, and issuing a report critical of the employee because, much to the dismay of the judge, the employee was engaged to be married to the judge's secretary] appears unprofessional, it is the general nature of the act that is determinative of the issue of immunity.").

Recognizing absolute judicial immunity in this case also furthers the central policy justifications behind the doctrine. Primarily because Judge Winchell was seated in his official capacity and deciding matters with respect to independent parties who invoked the jurisdiction of his court, the integrity and independence of judicial decisionmaking would be impaired if Judge Winchell is now called upon to account for his official decisions in a suit of this type. "It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants." *Pierson,* 386 U.S. at 554, 87 S.Ct. at 1218. In the underlying criminal prosecutions against Ms.

Barnes, her estranged spouse and his former wife brought allegations of criminal conduct before Judge Winchell, calling upon the judge to act. Undoubtedly, this scenario would rouse intense feelings in the parties. It is precisely when an issue facing a judge sparks intense emotions that the judge's fidelity to independent and fearless decision-making is of the utmost importance. *See Stump*, 435 U.S. at 364, 98 S.Ct. at 1108 (recognizing that the controversial nature of the issue "is all the more reason that [a judge] should be able to act without fear of suit."). To render a judge liable to answer in damages to every litigant who feels aggrieved during the course of judicial proceedings, "would destroy that independence without which no judiciary can be either respectable or useful." *Bradley*, 80 U.S. (13 Wall.) at 347.

Accordingly, we conclude that Judge Winchell's actions as the presiding judge in the underlying criminal prosecutions of Ms. Barnes do not amount to non-judicial acts stripping him of the absolute judicial immunity presumptively available to him.

### F. Claim of Absence of All Jurisdiction

 Having determined that Judge Winchell's actions were judicial, we next consider whether Judge Winchell acted in complete absence of all jurisdiction, the second prong of a judicial immunity inquiry. *See Mireles*, 502 U.S. at 12, 112 S.Ct. at 288. Ms. Barnes claims that Judge Winchell never properly acquired jurisdiction over the misdemeanor charges against her because the prosecutor had only authorized criminal trespass actions.

The term "jurisdiction" is to be broadly construed to effectuate the purposes of judicial immunity. *Stump*, 435 U.S. at 356, 98 S.Ct. at 1104–05. Acts done "in the clear absence of jurisdiction," for which no immunity is afforded, should be distinguished from actions in "excess of jurisdiction," which fall within the ambit of immunity protection. *Id.* at 357 n. 7, 98 S.Ct. at 1105 n. 7 (quoting *Bradley*, 80 U.S. (13 Wall.) at 351–52). Thus, for example, a criminal court judge would be immune from liability for convicting a defendant of a nonexistent crime, an act taken in

excess of his jurisdiction, whereas a probate court judge would not be immune from liability if he tried a criminal case because he clearly lacked all subject matter jurisdiction. *Id.* (citing *Bradley*, 80 U.S. (13 Wall.) at 352).

 Generally, where a court has some subject matter jurisdiction, there is sufficient jurisdiction for immunity purposes. *Adams*, 764 F.2d at 298. In *Sevier*, despite the fact that a judge of limited jurisdiction ordered the initiation of criminal and contempt proceedings, this court noted that the judge was "empowered to handle Juvenile Court cases ... [and], therefore, did not act in the clear absence of all jurisdiction." *Sevier*, 742 F.2d at 271; *see also Lopez*, 620 F.2d at 1234 (despite not being assigned to the particular branch of court, the judge was authorized by law to hear the kind of case in which he acted; his actions were not taken in clear absence of all jurisdiction).

 In this case, Judge Winchell had jurisdiction over the subject matter of the underlying actions. The Chillicothe Municipal Court has specific statutory jurisdiction over "the violation of any misdemeanor committed within the limits of its territory." OHIO REV. CODE ANN. § 1901.20(A) (Banks–Baldwin West 1996). "In any action or proceeding of which a municipal court has jurisdiction," a municipal court judge is further authorized "to exercise any other powers that are necessary to give effect to the jurisdiction of the court and to enforce its judgments, orders, or decrees." OHIO REV.CODE ANN. § 1901.13 (Banks–Baldwin West 1996). Although the municipal court is a court of limited, rather than general, jurisdiction, we have held that even "judges of courts of limited jurisdiction are entitled to absolute immunity for their judicial acts unless they act in the clear absence of all jurisdiction." *King v. Love*, 766 F.2d 962, 966 (6th Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 351, 88 L.Ed.2d 320 (1985).

In the present action, the complaint states that the local prosecuting authority had granted Scott and Carolyn Barnes authorization to initiate criminal proceedings against Ms. Barnes. Compl. ¶ 12. Both criminal trespass and menacing by stalking, the two

potential crimes at issue here, constitute misdemeanors over which the municipal court properly could maintain jurisdiction. Therefore, by statute, Judge Winchell was empowered to preside over the criminal proceedings that flowed from these misdemeanor complaints. Even assuming that there was a procedural problem with respect to the scope of the prosecutor's authorization, Judge Winchell was not wholly without jurisdiction. Such a situation would more closely resemble a judge convicting a criminal of a non-existent crime than a probate court judge trying a criminal case. Thus, Judge Winchell's actions were not taken in the clear absence of all jurisdiction.

Finally, included in the absolute judicial immunity balance is the availability of alternate forums and methods, apart from a civil suit for damages, for litigants to protect themselves from the potential consequences of actions taken by a judge. *See Forrester,* 484 U.S. at 227, 108 S.Ct. at 544 (emphasizing that a damages suit is not a litigant's only recourse: "Most judicial mistakes and wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability."). If Ms. Barnes felt that Judge Winchell was exceeding his authority or taking an inappropriate personal interest in her cases, she had at her disposal appropriate recourse through Ohio appellate courts, and/or the procedural mechanism to disqualify a municipal court judge, OHIO REV.CODE ANN. § 2937.20 (Banks–Baldwin West 1996). In fact, the complaint details that Ms. Barnes successfully utilized the latter method. Compl. ¶ 17.

## III. CONCLUSION

The factual allegations in Ms. Barnes's complaint describe a situation where, for judicial immunity purposes, Judge Winchell was acting in his judicial capacity and within the realm of his jurisdiction at all times pertinent to the legal claims presented. Under these circumstances, Ms. Barnes cannot overcome Judge Winchell's entitlement to absolute judicial immunity from suit for the acts complained of in the present action.

Her complaint, therefore, fails to state a claim with respect to Judge Winchell. Accordingly, the order of the district court denying Judge Winchell's motion to dismiss is **REVERSED** and the case is **REMANDED** to the district court with instructions to **DISMISS** the claims against defendant Winchell.