Christopher DePIERO, Plaintiff–Appellant,

v.

CITY OF MACEDONIA; Joseph Migliorini, in his official capacity as Mayor and Judge of the City of Macedonia's Mayor's Court, and in his individual capacity; Glenn Nicholl, in his official capacity as patrolman for the City of Macedonia, and in his individual capacity, Defendants–Appellees.

No. 98–3292.

United States Court of Appeals, Sixth Circuit.

Argued March 10, 1999.

Decided June 23, 1999.

Melissa Graham–Hurd (briefed), Augustin F. O'Neil (argued and briefed), Akron, OH, for Plaintiff–Appellant.

Joseph W. Diemert, Jr., Joseph W. Diemert, Jr. & Assoc., Cleveland, OH, John G. Peto (argued and briefed), Reminger & Reminger Co., L.P.A., Cleveland, OH, for Defendants–Appellees.

Before: MERRITT, KENNEDY, and FARRIS,* Circuit Judges.

* The Honorable Jerome Farris, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

## OPINION

KENNEDY, Circuit Judge.

We are called upon in this appeal to determine the constitutionality of the plaintiff's conviction in the Macedonia, Ohio Mayor's Court. After being prosecuted in the Macedonia Mayor's Court on traffic misdemeanor and contempt charges, plaintiff Christopher DePiero ("Plaintiff") filed suit under 42 U.S.C. § 1983 against defendants the City of Macedonia, Ohio, its mayor, Joseph Migliorini, in his official and individual capacities, and Officer Glenn Nicholl, in his official and individual capacities, alleging the denial of substantive and procedural due process rights. Plaintiff now appeals the district court's grant of summary judgment for the defendants and denial of his own motion for summary judgment on Counts I and II of his complaint, which claimed that Ohio Revised Code §§ 1905.01 et seq., the statute authorizing mayor's courts, is facially unconstitutional, and that plaintiff's trial in the Macedonia Mayor's Court deprived him of due process because Mayor Migliorini was not a "neutral and detached" magistrate. Plaintiff also appeals the district court's dismissal of Counts III, IV and V of his complaint, which respectively alleged: deprivation of his right against unreasonable seizure by determination of probable cause and issuance of an arrest warrant by a mayor who was simulta-

neously a "law enforcement officer;" deprivation of procedural due process by issuance of a parking citation containing no information as to how to contest the complaint; and a claim for damages against Officer Nicholl under 42 U.S.C. § 1983 for violating his rights under the Fourth Amendment by issuing a traffic ticket citing an ordinance without probable cause to believe plaintiff had violated that ordinance. Finally, plaintiff also appeals dismissal of his pendent state claim for malicious prosecution.

For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part.

## I. FACTUAL BACKGROUND

On December 4, 1994, plaintiff was issued a parking ticket in Macedonia, Ohio by police officer Glenn Nicholl ("Officer Nicholl") for violating Macedonia Codified Ordinance § 351.12.[1] Although the citation itself did not specify where, when, or how plaintiff might contest the complaint, a hearing on the citation was docketed in Macedonia Mayor's Court for December 27, 1994. After plaintiff failed to pay the ticket or appear in court, a summons was mailed to his home address on January 12, 1995 ordering him to appear in court on January 23, 1995 at 10:30 A.M. The summons warned, "If you fail to appear at the time and place stated above, you may be arrested." On February 7, 1995, after

---

1. The Ordinance under which plaintiff was cited is captioned "Prohibition Against Parking on Streets or Highways" and provides in pertinent part:

 Upon any street or highway outside a business or residence district, no person shall stop, park or leave any standing vehicle, whether attended or unattended, upon the paved or main traveled street or highway if it is practicable to stop, park or leave such vehicle off the paved or main traveled part of such street or highway. In every event, a clear and unobstructed portion of the street or highway opposite such standing vehicle shall be left for free passage of other vehicles, and a clear view of such stopped vehicle shall be available from a distance of 200 feet in each direction upon such street or highway.

 Macedonia Codified Ordinances Title VII, § 351.12.

 Officer Nicholl later filed an affidavit in this case in which he conceded that he referred to the wrong ordinance on plaintiff's parking ticket and that another section of the code should have been cited. Officer Nicholl contends that there were "no parking" signs posted where the vehicle was parked and that plaintiff had parked on the roadway in the right turn lane, both of which are prohibited by ordinance. Plaintiff, on the other hand, maintains that there were no "no parking" signs posted where he parked his car on December 4, 1994. (Brief of Plaintiff–Appellant at 9).

plaintiff failed to pay the fine for the violation or appear to contest the ticket in Mayor's Court, Mayor Joseph Migliorini issued a bench warrant for plaintiff's arrest and set bond at $250.00. The warrant was issued by Mayor Migliorini as "Magistrate/Mayor." As a result of plaintiff's failure to appear in Mayor's Court, a criminal contempt charge was also brought against him.

On March 6, 1995, plaintiff was stopped by a police officer in Boston Heights, Ohio, another municipality, for an unrelated traffic offense. The officer informed plaintiff of the Macedonia bench warrant, handcuffed him, and brought him into custody to the Boston Heights police department, where he was later transported in handcuffs to the police station in Macedonia. Plaintiff was released from custody after posting the $250.00 cash bond. At his arraignment on April 3, 1995, plaintiff pleaded not guilty to the traffic and contempt charges against him and his case was set for trial. Plaintiff was tried in Mayor's Court on April 17, 1995. At trial, Mayor Migliorini found plaintiff guilty of both a misdemeanor parking violation, for which he fined plaintiff $50, and the criminal contempt charge, for which he fined plaintiff $100.e

Plaintiff appealed his convictions to the Cuyahoga Falls Municipal Court, which dismissed both charges against him on June 20, 1995.[2]

## II. PROCEDURAL BACKGROUND

Based on the aforementioned facts, plaintiff filed this action under 42 U.S.C. § 1983 in the United States District Court for the Northern District of Ohio against the City of Macedonia, and against Mayor Migliorini and Officer Nicholl in their official and individual capacities. Count I of plaintiff's complaint essentially alleges that adjudication and sentencing by Mayor Migliorini in the contested traffic and criminal contempt proceedings deprived plaintiff of due process. Count II contends that, on its face, the Ohio statute authorizing mayor's courts is an unconstitutional violation of due process because it permits adjudication and sentencing by a Mayor whose executive responsibilities encompass revenue production and law enforcement. Count III alleges that Mayor Migliorini's issuance of a bench warrant for his arrest violated plaintiff's rights under the Fourth and Fourteenth Amendments because the Mayor was not "neutral and detached" from law enforcement. Count IV of plaintiff's complaint claims violation of his procedural due process rights because the traffic citation issued by Officer Nicholl did not inform him how he might contest the complaint. Count V of the complaint alleges violation of plaintiff's right to be free from unreasonable seizure under the Fourth Amendment because Officer Nicholl ticketed him for violating § 351.12 of the Macedonia Codified Ordinances without probable cause.Finally, Count VI set forth a pendent state law claim against Officer Nicholl for malicious prosecution.

Plaintiff filed for summary judgment on Counts I–V of his complaint on January 16, 1997. On June 19, 1997, the district court denied plaintiff's motion as to Counts I and II, and dismissed Counts III, IV and V *sua sponte* as insufficient as a matter of law. In October 1997, plaintiff and defendants filed a joint stipulation of facts and each also filed motions for summary judgment on Counts I and II. On February 17, 1998, the district court denied plaintiff's motion, but granted defendants' motion for summary judgment as to Counts I and II, dismissed plaintiff's pendent state claim for lack of jurisdiction, and issued a judg-

2. The process of appealing from the decision of a mayor's court is governed by state statute. The relevant provision states that "[a]ppeals from a mayor's court may be taken to the municipal court or county court having jurisdiction within the municipal corporation." Ohio Rev.Code § 1905.22 (1970). Appeals from a mayor's court to the municipal court or county court proceed as a trial *de novo*. Ohio Rev.Code § 1905.25 (1970).

ment terminating the case. Plaintiff then filed a timely notice of appeal.

## III. DISCUSSION

Plaintiff now appeals the district court's denial of plaintiff's motions for summary judgment on Counts I, II, III, IV and V, its grant of summary judgment for defendants on Counts I and II, and the district court's *sua sponte* dismissal of Counts III, IV, V and VI of his complaint. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(district courts possess power to enter summary judgments *sua sponte,* so long as losing party on notice that she had to come forward with all of her evidence). This court reviews a district court's grant or denial of summary judgment *de novo. Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir.1997). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Entry of summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548. We also review *de novo* the district court's dismissal for failure to state a claim upon which relief can be granted. *Cline v. Rogers,* 87 F.3d 176, 179 (6th Cir.1996). We must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Id.* (citing *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993)).

## A. Constitutional Challenges to Proceedings in the Macedonia Mayor's Court

Plaintiff contends first that the district court erred in denying his own but granting the defendants' motion for summary judgment on the first two counts of his complaint. In these counts, plaintiff submits that the Ohio statute authorizing mayor's courts on its face violates due process, and that his adjudication and sentencing before Mayor Migliorini in particular was an unconstitutional deprivation of due process because Mayor Migliorini, as a law enforcement officer and chief executive responsible for the financial condition of the municipality, was not "neutral and detached." Plaintiff also appeals dismissal of the third count of his complaint, which challenged Mayor Migliorini's issuance of a bench warrant for plaintiff's arrest for failure to appear in Mayor's Court. We address each of these issues in turn.

### i. Facial Challenge to Section 1905.01

Plaintiff asks us to strike down the Ohio statute authorizing mayor's courts as unconstitutional on grounds it deprives plaintiff of a substantive right under the Due Process Clause of the Fourteenth Amendment to have a disinterested and impartial judge adjudicate and sentence in any criminal case in which he is a defendant. Amended Complaint, Count II, at 17, J.A. 47–48.

Section 1905.01 of the Ohio Revised Code authorizes mayors to preside over prosecutions for violations of a municipal ordinance and for certain parking and moving traffic violations "[i]n all municipal corporations not being the site of a municipal court" nor a place where a judge of the Auglaize, Crawford, Jackson, Miami, Portage or Wayne county municipal courts sits. *See* Ohio Rev.Code § 1905.01(A)-(C). In lieu of personally sitting in judgment, mayors are also authorized by statute to appoint a magistrate to preside over any prosecutions that may be tried in mayor's

court. Ohio Rev.Code § 1905.05. The magistrate is vested with the same power as the mayor to decide prosecutions, enter judgment and impose sentences; the judgment and sentence need not be reviewed or approved by the appointing mayor "and have the same force and effect as if they had been entered or imposed by the mayor." Ohio Rev.Code § 1905.05(A). At the time of plaintiff's prosecution, cases in the Macedonia Mayor's Court were presided over by either Mayor Migliorini or an appointed magistrate. Mayor Migliorini himself presided over plaintiff's trial.

The constitutionality of mayor's courts is an issue familiar to our Circuit and our analysis of the questions raised in this case is not without guidance. Through the twentieth century, persistent constitutional challenges to the Ohio mayor's courts have found their way to the Supreme Court of the United States. *See e.g., Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), *Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928), *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). Though presented with the opportunity to do so, the Supreme Court has declined to strike down the mayor's courts altogether. In *Tumey v. Ohio,* Chief Justice Taft observed that "[i]t is … so common to vest the mayor of villages with inferior judicial functions that the mere union of the executive power and the judicial power in him cannot be said to violate due process of law." *Tumey,* 273 U.S. at 534, 47 S.Ct. 437. In *Dugan v. Ohio,* the Supreme Court upheld a criminal conviction in a mayor's court where the mayor exercised primarily judicial functions and the city manager, not the mayor, was the acting chief executive of the municipality. *Dugan,* 277 U.S. at 63, 48 S.Ct. 439. As the Supreme Court has found no fatal defect in the overarching system that permits a mayor simultaneously to exercise some combination of executive and judicial functions, we affirm the district court's grant of summary judgment for the defendants and its denial of summary judgment for the plaintiff to the extent plaintiff has challenged the facial validity of Section 1905.01 of the Ohio Revised Code.

### ii. Adjudication and Sentencing by Mayor Migliorini

 Although the State of Ohio is free to authorize mayor's courts in theory, the structure of the courts in practice must be such that the particular combination of executive powers vested in the mayor does not impair his ability to serve also as a neutral arbiter. Plaintiff contends that he was deprived of due process when Mayor Migliorini presided over his contested case because the breadth of his executive powers preclude his ability to act as a neutral arbiter. *See* Amended Complaint, Count I, at 16–17, J.A. 46–47. The test for whether the union of executive and judicial power violates due process is whether "the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused …'" *Ward v. Village of Monroeville,* 409 U.S. 57, 60, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (quoting *Tumey,* 273 U.S. at 532, 47 S.Ct. 437).

Accordingly, the Supreme Court has held that the Fourteenth Amendment right to due process is certainly compromised where the decision maker has a "direct, personal, substantial pecuniary interest" in the proceedings. *Tumey,* 273 U.S. at 523, 47 S.Ct. 437. In *Tumey v. Ohio,* the Supreme Court held that the mayor's court for the Village of North College Hill, Ohio deprived the defendant of due process in a prosecution under Ohio's prohibition statute where, between May 11, 1923 and December 31, 1923, the mayor received $696.35 from liquor-related cases as fees and costs in addition to his regular salary. *Tumey,* 273 U.S. at 521–22, 47 S.Ct. 437. The mayor was neither neutral nor detached because he had a

"direct personal pecuniary interest in convicting the defendant who came before him for trial, in the amount of $12 of costs imposed in his behalf, which he would not have received if the defendant had been acquitted." *Id.* at 523, 47 S.Ct. 437. In contrast, the following year, the Supreme Court upheld a conviction in the mayor's court for the City of Xenia, Ohio where the mayor's vulnerability to bias was diluted. *See Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928). The mayor was not disqualified as a judge because, unlike the mayor in *Tumey,* he was not the chief executive, but one of five members of the city commission. Instead, the city manager was the active executive. *Id.* at 63, 48 S.Ct. 439. Also unlike *Tumey,* the mayor's salary was fixed by the city commission and he received no fees for cases tried in mayor's court. *Id.* at 62–63, 48 S.Ct. 439. *See also State ex. rel. Brockman v. Proctor,* 35 Ohio St.2d 79, 298 N.E.2d 532, syllabus ¶ 3 (1973) (in municipality where mayor has judicial functions in addition to legislative powers and duties, but city manager has all executive power and administrative responsibility, mayor's relation to finances and financial policy of municipality is too remote to warrant presumption of bias toward convictions in prosecutions before him as judge).

Although the direct personal pecuniary interest of a mayor in the result of his judgment is arguably one of the most flagrant forms of bias, it is not the only reason for holding that due process is denied. *Tumey,* 273 U.S. at 532, 47 S.Ct. 437. The Supreme Court recognized in *Tumey* that the mayor's interest in and his responsibility for the financial condition of the village gave him a strong "official motive to convict and graduate the fine to help the financial needs of the village." *Id.* at 535, 47 S.Ct. 437. The Court elaborated upon this formulation of the "possible temptation" test in *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). In *Ward,* the mayor of Monroeville enjoyed broad executive powers and was the chief conservator of the peace. Under the Monroeville Charter, the mayor was president of the village council, presided at council meetings, voted on the council in case of a tie, accounted annually to the council regarding village finances, filled vacancies in village offices and had general supervision of village affairs. *Ward,* 409 U.S. at 58, 93 S.Ct. 80. In addition, a "major part" of the village income, 35 to 50 percent of the village's general revenues, came from fines, forfeitures, costs, and fees imposed by the mayor in the mayor's court.[3] The Court held that the defendant, who was convicted of two traffic offenses in the mayor's court, was deprived of a neutral and detached magistrate, and therefore due process, because "possible temptation" may exist not only when the mayor has direct personal pecuniary interest but also when "the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." *Ward,* 409 U.S. at 60, 93 S.Ct. 80. The degree of executive authority wielded by the mayor was a significant factor in the inquiry and wholly distinguished the case from *Dugan,* in which the mayor "had judicial functions but only very limited executive authority." *Id.* In comparison, the *Ward* mayor's broad executive powers and the significance of the mayor's court revenues to the fiscal health of the village, for which he was responsible, made his position inherently partisan.

---

3. The Court described the mayor's court's contributions to the village's coffers over five years as follows:

[I]n 1964 this income contributed $23,589.50 of total village revenues of $46,355.38; in 1965 it was $18,508.95 of $46,752.60; in 1966 it was $16,085 of $43,585.13; in 1967 it was $20,060.65 of $53,931.43; and in 1968 it was $23,439.42 of $52,995.95. This revenue was of such importance to the village that when legislation threatened its loss, the village retained a management consultant for advice upon the problem.

*Ward,* 409 U.S. at 58, 93 S.Ct. 80 (footnote omitted).

In a recent decision addressing the constitutionality of convictions in the mayor's court in the Village of Peninsula, Ohio, the United States District Court for the Northern District of Ohio attempted to sort out seemingly conflicting standards employed by the Supreme Court of Ohio. *See Rose v. Village of Peninsula,* 875 F.Supp. 442 (N.D.Ohio 1995). At issue was whether, after the United States Supreme Court's decision in *Ward,* the "substantiality" of mayor's court revenues as a percentage of overall revenues was determinative.[4] The court held that while

... substantiality is clearly an important factor in the analysis, the thrust of the inquiry is whether the mayor "occupies two practically and seriously inconsistent positions, one partisan and the other judicial." *Ward,* 409 U.S. at 60, 93 S.Ct. at 83 (quoting *Tumey,* 273 U.S. at 534, 47 S.Ct. at 445). The court's assessment of substantiality is merely a step in its determination of whether the degree of separation of the executive and judicial powers vested in mayor-judges adequately safeguards, on average, those judges' impartiality.

The amount of mayor's court fee revenues is just one measure of whether the mayor may reasonably be questioned as being impartial. The more substantial the amount (or percentage) of revenue produced from a mayor's court, the more reasonable it is to question the impartiality of a mayor who has any executive authority. In similar fashion, the more executive authority vested in the mayor, the more reasonable it is to question the impartiality of a mayor who collected even a relatively minor amount of general revenue through a mayor's court. Thus, inadequate separation of powers in a mayor-judge may occur despite the mayor's court's collection of a fairly small percentage of general fund revenue.

*Rose,* 875 F.Supp. at 452. Therefore the court held although substantiality of revenues is an important factor to consider, it is not a determinative factor and the absence of evidence of substantiality does not necessitate a finding of impartiality. *See id.* (discussing hypothetical mayor's court that collects only one $7 fine in one year and concluding "[t]he relative insubstantiality of the $7 fine" compared to an annual general fund of $700,000 "does not conclusively establish the mayor's impartiality.").

4. The *Rose* court explained the apparent inconsistencies in the decisions of the Ohio Supreme Court as follows:

> In *State ex rel. Brockman v. Proctor,* 35 Ohio St.2d 79, 64 O.O.2d 50, 298 N.E.2d 532 (1973), the court completely ignored substantiality as a measure of the constitutionality of the mayor's court, simply holding that "[t]he trial of a defendant charged with a traffic offense by a mayor acting as judge, who is also chief executive and administrative officer of the municipality, and who as such officer is responsible for the financial condition of the municipality, violates due process of law." *Id.* at syllabus ¶ 2. In *Covington v. Lyle,* 69 Ohio St.2d 659, 23 O.O.3d 535, 433 N.E.2d 597 (1982), however, the Ohio Supreme Court accepted the trial court's having taken judicial notice that "revenue from the Mayor's court does not constitute a substantial portion of the revenue of the Village of Covington," and concluded that the system in place in that village survived constitutional attack under *Ward.*

*Rose,* 875 F.Supp. at 451, n. 6. Justice Holmes, joined by Chief Justice Celebrezze, dissented in *Covington.* Justice Holmes concluded that the majority strayed from its position in *Brockman* and incorrectly focused upon substantiality of funds generated by the mayor's court. "Rather, it was the relationship between the mayor as judge and as chief executive and administrative officer of the municipality which was the key factor." *Covington,* 69 Ohio St.2d at 666, 433 N.E.2d at 601–02. Justice Holmes would have held that the requirements of due process preclude the mayor of a village with the statutory form of government, like the Village of Covington, Ohio, from trying contested cases altogether. *See id.* The Northern District of Ohio agreed in *Rose* "that the dissenters in *Covington* have the more correct interpretation of *Ward.*" *Rose,* 875 F.Supp. at 451 n. 6 (quoting *Rose v. Village of Peninsula,* 839 F.Supp. 517, 523 (N.D.Ohio 1993)).

In *Rose*, fines from the mayor's court ranged from 11.8 to 13.9 percent of the general fund annually over a period of three years. In addition, the mayor shared the same level of executive power as the mayor in *Ward*, his powers were governed by the same statutes,[5] and those powers were not diluted as they were in *Dugan*. *Rose*, 875 F.Supp. at 450. The court concluded that both the "substantiality" of the mayor's courts revenues, which comprised over 10 percent of the general fund, and the "combination and level" of the mayor's executive powers demonstrated the mayor's partiality:

> In this case, the level of executive authority vested in Mayor Ruoff is broad, so that it becomes reasonable to question [his] impartiality even if he collects a fairly small amount of general fund revenue through the mayor's court. Furthermore, the amount of general fund revenue produced form Mayor Ruoff's court is, though not enormous, substantial. These undisputed facts compel the Court to conclude that Mayor Ruoff "occupies two practically and seriously inconsistent positions ... [which] necessarily involves a lack of due process of law in the trial[s] ... before him." *Tumey*, 273 U.S. at 534, 47 S.Ct. at 445. Defendant Rose "[might] with reason say that he feared he could not get a fair trial or a fair sentence." *Id.* at 533, 47 S.Ct. at 445.

*Rose*, 875 F.Supp. at 453. Though we are not bound by the *Rose* court's opinion, we find it an articulate and persuasive synthesis of the mayor's court decisions.

Thus, in the instant case, while the percentage of Macedonia's general fund generated from Mayor's Court revenues is relevant to our inquiry, we must also assess the potential impact of the breadth of executive authority vested in the Mayor of Macedonia. Focusing on the court's observation in *Rose* that "[c]ertainly, any person suddenly deprived of 10% or more of his income would find the loss 'substantial,'" *Rose*, 875 F.Supp. at 451, plaintiff urges us to consider that nine percent of Macedonia's general fund was derived from Mayor's Court fines in 1990. Approximately four percent of the general fund was derived from Mayor's Court fines in each year from 1994 to 1996, the time period most contemporary to plaintiff's arrest. The defendants would instead have us rely upon the net revenues generated by the Mayor's Court after deducting costs of operation. These apparently amounted to approximately two percent of the general fund. We see no need to split hairs over what is a "substantial" figure, however, if the mayor's executive authority and administrative responsibilities preclude him from serving as a neutral and detached decision maker. The question for this court therefore becomes whether the level of executive authority vested in the Mayor of Macedonia is broad "so that it becomes reasonable to question [his] impartiality even if he collects a fairly small amount of general fund revenue through the mayor's court." *Rose*, 875 F.Supp. at 453.

Plaintiff contends that the powers vested in the Mayor of Macedonia by charter preclude him from also presiding over the Mayor's Court. Like the mayors in *Ward* and *Rose*, the Mayor of Macedonia is *vested* with broad executive powers. Under the Charter of the Municipality of Macedonia, Ohio ("Charter"), the Mayor is the "chief conservator of the peace" and shall "cause all laws to be enforced." Charter § 3.03(a). He exercises control over all departments and divisions of the municipality except the City Council. He presides over all Council meetings. He does not participate in deliberations, but votes in the event of a tie. He has the right to recommend and introduce legislation to the Council, and has veto power over ordinances and resolutions adopted by the Council, subject to override by a vote of at

---

**5.** These statutes included Ohio Rev.Code §§ 733.23, 733.24, 733.30–35, 733.41, 737.15 and 737.16 governing the executive power in villages.

least two-thirds of the Council members. Charter § 3.03(b). He must prepare an annual budget and submit it to the Council, and has "the power to appoint, promote, discipline, transfer, reduce, or remove any official or employee, except those elected under the Charter and except employees of the Council." Charter § 3.03(a). The Mayor appoints Department Heads subject to confirmation of a majority vote of those members elected to Council, or votes to disaffirm the appointment by two-thirds of the Council members. The appointment is automatically confirmed in the event of the Council's failure to either confirm or disaffirm within 30 days. *Id.* The Mayor also appoints civil servants through the Municipal Civil Service Commission ("Commission"). For example, police officers, who are "classified" employees under the Commission's regulations, must submit to examinations administered by the Commission, character and fitness evaluations, and must fulfill other qualifications before the Commission will recommend them for appointment. The Commission certifies three eligible applicants for each job opening and the Mayor may appoint from this list. The Mayor may bypass the Commission and make direct, temporary appointments in the event of an emergency. *See* Rules and Regulations of the Civil Service Commission of the City of Macedonia, Rules IV–VI (1991). Finally, the Mayor of Macedonia must supervise the administration of municipal affairs, perform "other duties as required by the Charter, the Council, and the laws of the State of Ohio," and has "all other executive powers provided for mayors of municipalities" in the Ohio Revised Code. Charter § 3.03(a). While the Charter clearly permits the mayor to delegate certain executive responsibilities for more efficient administration, he ultimately holds a degree of executive power comparable to the mayors in *Ward* and *Rose*, both of whose mayor's courts were found unconstitutional.

Defendants on the other hand urge us to focus, as the district court did, not upon the powers with which the mayor is vested, but upon those that Mayor Migliorini personally exercises and whether he was actually biased in presiding over plaintiff's case. The district court distinguished *Rose* from this case because *Rose* "was premised upon the notion that the mayor 'appoints the chief of police and police officers,'" while the district court concluded that there was no evidence to suggest Mayor Migliorini personally selected either Macedonia's Chief of Police or Officer Nicholl, even though the Macedonia Charter ostensibly gives the Mayor the power to do so. Mem. Op. and Order of June 19, 1997, at 10–11, J.A. 142–43. The district court also rejected plaintiff's contention that Mayor Migliorini might be biased in favor of Officer Nicholl because the Mayor "appointed" him. As the evidence only showed that the mayor appointed Officer Nicholl "as a purely formal act in the discharge of the mayor's executive responsibility to appoint police officers under the municipality's civil service rules," and not that he "had any history with" or in any way "handpicked" Officer Nicholl, there was insufficient evidence to conclude as a matter of law that Mayor Migliorini possessed "a possible temptation to be partial to the word of Nicholl over [plaintiff] within the meaning of *Ward*." Mem. Op. and Order of Feb. 17, 1998, at 13, J.A. 262. The district court declined to hold the Mayor's Court unconstitutional based only upon the powers vested in the mayor under the Charter without regard to proof of actual bias:

> A finding that Mayor Migliorini possesses a possible temptation to be partial to Nicholl on the evidence presented in this case would indicate that no contested traffic case could constitutionally be tried in mayor's court where the mayor had exclusive responsibility for the ticketing police officer. This court is reticent to reach such a *per se* rule in light of the dramatically different holding in *Ward.*

Mem. Op. and Order of Feb. 17, 1998, at 14, J.A. 263.

There are several problems with the district court's conclusions. First, the holding in *Ward* is not "dramatically different." *Ward* held that "possible temptation" may exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. *Ward*, 409 U.S. at 60, 93 S.Ct. 80. Similarly, there may exist a "possible temptation" for a mayor presiding over a contested traffic case to give undue credence to a ticketing police officer for whom the mayor has ultimate appointment responsibility. Second, the district court's attempt to distinguish this case from *Rose* and *Ward* as those cases were premised on the notion that the mayor "appoints the chief of police and police officers," whereas Mayor Migliorini does not, is unpersuasive. The Mayor of Macedonia exercises discretion in the appointment of police officers, albeit after the job applicants have been recommended by the Civil Service Commission. For each opening, the Commission certifies the three top applicants and the mayor chooses one. The district court's emphasis on the lack of proof of actual bias misconstrues the point of the test we must apply. The Supreme Court's test does not call for proof of actual temptation. The mere *possibility* of temptation to ignore the burden of proof is all that is required. Where, as here, Mayor Migliorini was the chief conservator of the peace, retained ultimate responsibility for law enforcement and preparation of the city's budget, and appointed the officer who issued plaintiff's parking ticket, there existed the possibility that Mayor Migliorini would be tempted to forget the burden of proof and defer to the officer's version of

events, even though Mayor Migliorini possessed no "actual" temptation or bias.

The broad reach of Mayor Migliorini's executive powers and his sweeping administrative responsibilities necessarily puts him in "two practically and seriously inconsistent positions, one partisan and the other judicial." *Ward*, 409 U.S. at 60, 93 S.Ct. 80 (quoting *Tumey*, 273 U.S. at 534, 47 S.Ct. 437). That under the Charter he may delegate administrative responsibilities for more efficient administration dilutes neither the power with which he is vested nor his accountability for law enforcement and the fiscal health of the municipality as its chief executive. Because the plaintiff was deprived due process when Mayor Migliorini tried his contested traffic and criminal contempt charges, we reverse the district court's grant of summary judgment for the defendants and its denial of summary judgment for the plaintiff on Count I of his complaint.[6]

### *iii. Issuance of Bench Warrant for Plaintiff's Arrest*

Plaintiff claims that because Mayor Migliorini was not an impartial decision maker, plaintiff was also deprived of his right under the Fourth and Fourteenth Amendments against issuance of an arrest warrant by a person who is not neutral and detached from law enforcement. *See* Amended Complaint, Count III, at 19, J.A. 49. It is well-settled that the signing and issuance of an arrest warrant are to be undertaken only by a "neutral and detached" judicial officer. *Coolidge v. New Hampshire*, 403 U.S. 443, 449, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (state attorney general personally in charge of investigating a widely publicized murder, and who later acted as chief prosecutor at trial, ought not to have issued a search warrant

---

**6.** We *do not* decide in this case whether plaintiff would have been deprived due process had his case been tried by the Mayor's Court Magistrate instead of Mayor Migliorini himself. It is worth noting, however, that mayor's court magistrates are less vulnerable to potential bias. Mayor's court magistrates are

appointed by the mayor, but exercise only judicial functions. *See* Ohio Rev.Code § 1905.05. Moreover, they possess some degree of insulation from the mayor's influence as their decisions are not subject to the appointing mayor's review or approval. *See id.*

in the case); *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)("inferences [of probable cause must] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."); *United States v. Weaver*, 99 F.3d 1372, 1376 (6th Cir.1996)("the court must ... insist that the magistrate perform his 'neutral and detached' function and not serve merely as a rubber stamp for police.'"). *See also Shadwick v. City of Tampa*, 407 U.S. 345, 350–51, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972)(municipal court clerks neutral and detached, and therefore able to issue warrants for persons charged with breach of municipal ordinances because removed from prosecutor and police and supervised by municipal court judges); *United States v. Bowers*, 828 F.2d 1169, 1174–75 (6th Cir.1987) (district court judge's judicial supervision of city water and sewerage department pursuant to federal court order did not render him incapable of acting as a "neutral and detached" judicial officer in reviewing wiretap application pertaining to criminal investigation of water and sewerage department).

Defendants' contention that the Mayor could validly issue a bench warrant for plaintiff's arrest because the Mayor is only a law enforcement officer when acting in that capacity, and that there is no evidence Mayor Migliorini acted in his capacity as "chief conservator of the peace" when presiding over Mayor's Court, simply cannot be reconciled with our holding in Part A, *supra*, that a deprivation of due process occurred when Mayor Migliorini presided over plaintiff's trial. In evaluating plaintiff's challenge to issuance of the bench warrant, the district court distinguished the process of making credibility determinations in a trial on a substantive offense from the process of determining whether a party is in contempt: "[t]here does not appear to be any reason to suggest that the mayor could not be 'neutral and detached' in determining whether [plaintiff] failed to appear" in court. Mem. Op. and Order of June 19, 1997, at 13, J.A. 145 (citing *United States v. Evans*, 574 F.2d 352, 355 (6th Cir.1978)). We have held today, however, that the deprivation of due process occurred because the powers with which he was vested necessarily put him in "two practically and seriously inconsistent positions." By virtue of the breadth of his executive powers and administrative responsibilities, Mayor Migliorini lacked authority to preside over the Mayor's Court. Therefore we are also compelled to find that plaintiff was deprived of due process when the Mayor issued a bench warrant for plaintiff's arrest on account of his failure to appear in Mayor's Court. Accordingly, we reverse the district court's dismissal of Count III of plaintiff's complaint.

## B. Immunity

Having found that plaintiff suffered a due process violation when Mayor Migliorini issued a bench warrant for his arrest and then presided over his trial for traffic misdemeanor and contempt charges, we now turn our attention to whether the Mayor and the City enjoy immunity from liability for damages. Plaintiff has filed suit against Mayor Migliorini in his official capacity as "Mayor and Judge of the City of Macedonia's Mayor's Court" and in his individual capacity.

### i. *Absolute Judicial Immunity*

Plaintiff argues that Mayor Migliorini is not protected by absolute judicial immunity because he lacked jurisdiction to try plaintiff's case. Judges are generally absolutely immune from civil suits for money damages, including § 1983 suits. *Mireles v. Waco*, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991); *Pierson v. Ray*, 386 U.S. 547, 553–54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Barnes v. Winchell*, 105 F.3d 1111, 1115 (6th Cir.1997). This far-reaching protection "is justified 'by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be

impaired by exposure to potential damages liability.' " *Barnes*, 105 F.3d at 1115 (quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993)). Accordingly, absolute judicial immunity is overcome only in two situations. First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction. *Mireles*, 502 U.S. at 11–12, 112 S.Ct. 286 (citations omitted); *see also Barnes*, 105 F.3d at 1116 (same).

 Whether an action is judicial depends on the " 'nature' and 'function' of the act, not the 'act itself.' " *Mireles*, 502 U.S. at 13, 112 S.Ct. 286 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)). This functional analysis typically turns on two factors set forth by the Supreme Court in *Stump v. Sparkman*. First, looking to the nature of the act, courts must determine "whether it is a function normally performed by a judge." *Stump*, 435 U.S. at 362, 98 S.Ct. 1099. This determination requires the court to "look to the particular act's relation to a general function normally performed by a judge." *Mireles*, 502 U.S. at 13, 112 S.Ct. 286. Second, looking to the expectations of the parties, courts must assess whether the parties dealt with the judge in his or her judicial capacity. *Ireland v. Tunis*, 113 F.3d 1435, 1441 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 560, 139 L.Ed.2d 401 (1997) (citing *Stump*, 435 U.S. at 362, 98 S.Ct. 1099).

Mayor Migliorini's presiding over the traffic citation and contempt hearing and his issuance of a bench warrant for plaintiff's arrest were certainly judicial acts under this two-pronged inquiry. Rulings on violations of municipal ordinances, including parking ordinances, is a function normally performed by the judge of a mayor's court. *See Hogan v. Lebanon*, 73 Ohio App.3d 230, 237, 596 N.E.2d 1092, 1096

(1991). Plaintiff dealt with Mayor Migliorini in his judicial capacity presiding over the traffic misdemeanor trial. The act of citing and incarcerating a party for contempt of court where the court has subject matter jurisdiction over the charge is also a judicial act to which absolute judicial immunity attaches. *Compare King v. Love*, 766 F.2d 962, 968 (6th Cir.1985) (judge absolutely immune from suit for damages stemming from incident in which he jailed motorist charged with driving while intoxicated for contempt, although action exceeded judge's authority, since court had subject matter jurisdiction over charge and incarcerating defendant for contempt was judicial act), *with Harper v. Merckle*, 638 F.2d 848, 859 (5th Cir.1981) (holding plaintiff in contempt and incarcerating him were not judicial acts where controversy that led to incarceration did not center around any matter pending before the judge, but around domestic problems of plaintiff's former wife who worked at the courthouse). It is well-settled in this Circuit that the issuance of an arrest warrant is a judicial act for judicial immunity purposes. *See, e.g., Ireland v. Tunis*, 113 F.3d at 1441–42; *Foster v. Walsh*, 864 F.2d 416, 417–18 (6th Cir.1988); *cf. Burns v. Reed*, 500 U.S. 478, 492, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (issuance of a search warrant is unquestionably a judicial act). Thus, Mayor Migliorini enjoys absolute immunity from liability for damages arising both from the due process violation that occurred when he tried plaintiff for the substantive offenses charged, and the due process violation arising out of his issuance of a bench warrant for plaintiff's arrest.

 Plaintiff also contends that, on jurisdictional grounds, Mayor Migliorini cannot enjoy absolute immunity from liability under § 1983. Plaintiff claims he had the right to a jury trial under state law because he faced a combined potential penalty exceeding $100.[7] He neither

---

7. Ohio Rev.Code § 2945.17 provides that "[a]t any trial, in any court, for the violation

waived this right nor did the Mayor certify the case to a competent court of record as required by state statute.[8] According to plaintiff, the Mayor therefore acted in the absence of jurisdiction to try his contested case. *See Schorle v. City of Greenhills,* 524 F.Supp. 821, 828 (S.D.Ohio 1981)(judge of mayor's court without jurisdiction to hear contempt case when accused refused to waive right to jury trial). With respect to this jurisdictional inquiry, the Supreme Court has instructed that:

> [T]he scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction."

*Stump,* 435 U.S. at 356–57, 98 S.Ct. 1099 (quoting *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1871)) (footnote omitted). If the matter upon which the judge acts is clearly outside the subject matter jurisdiction of the court over which the judge presides, the act is done in the clear absence of all jurisdiction. *King,* 766 F.2d at 965. "[W]here a court has some subject matter jurisdiction, there is sufficient jurisdiction for immunity purposes." *Barnes,* 105 F.3d at 1122; *Adams v. McIlhany,* 764 F.2d 294, 298 (5th Cir.1985). By contrast, merely acting in excess of authority does not preclude immunity. See *Sevier v. Turner,* 742 F.2d 262, 271 (6th Cir. 1984). For example, a criminal court judge would be immune from liability for convicting a defendant of a nonexistent crime, an act taken in excess of jurisdiction, whereas a probate court judge would not be immune for trying a criminal case, an act for which the probate judge clearly lacked all subject matter jurisdiction. *Stump,* 435 U.S. at 357, n. 7, 98 S.Ct. 1099.

Here, the Mayor's Court had subject matter jurisdiction over traffic tickets where the potential penalty did not exceed $100 and over contempt for failure to appear. Plaintiff was charged with a parking violation carrying a potential penalty of $50. He also failed to appear for his hearing on February 7, 1995. The Mayor therefore had subject matter jurisdiction over plaintiff's case sufficient to confer absolute immunity from liability. Adjudication and sentencing of plaintiff's case despite the fact that plaintiff never waived his right to a jury trial at most amounts to an act taken in excess of Mayor Migliorini's jurisdiction, not action in the clear absence of all jurisdiction. Thus, Mayor Migliorini is immune from liability for these actions performed in his official capacity.

### ii. Qualified Immunity

"Under the doctrine of qualified immunity, government officials acting in their official capacities are protected from being sued in their individual capacities for damages if their actions did not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Greene v. Reeves,* 80 F.3d 1101, 1104 (6th

---

of any statute of this state, or of any ordinance of any municipal corporation, except in cases in which the penalty involved does not exceed a fine of one hundred dollars, the accused has the right to be tried by a jury."

8. When a defendant enters a plea of not guilty to a misdemeanor charge in a court not of record, such as a mayor's court,

... if the nature of the offense is such that right to jury trial exists, such matter shall not be tried before [the presiding magistrate] unless the accused, by writing subscribed by him, waives a jury and consents to be tried by the magistrate. If the defendant in such event does not waive right to jury trial, then the magistrate shall require the accused to enter into recognizance to appear before a court of record in the county[.]

Ohio Rev.Code § 2937.08. *See also* Ohio Rev. Code § 2938.04 ("failure to waive jury in writing where right to jury trial may be asserted shall require the magistrate to certify such case to a court of record as provided in section 2937.08 of the Revised Code.").

Cir.1996)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). At the time of plaintiff's trial, it was not "clearly established" that Mayor Migliorini would deprive the plaintiff of due process by presiding over the hearing or by issuing a warrant for plaintiff's arrest. The majority of mayor's court cases decided in federal courts prior to the time of plaintiff's trial involved decisionmakers with "direct, personal, substantial pecuniary interest" in the proceedings or mayor's court revenues representing substantial contributions to the general fund. Also, as we have explained in Part A of this opinion, state court decisions have been far from clear as to whether the focus of the due process inquiry is substantiality of the revenues generated by the mayor's court or the relationship between the mayor as judge and as chief executive and administrative officer of the municipality. *See supra* note 4. Because the law was not clearly established that Mayor Migliorini lacked jurisdiction to try plaintiff's case, he enjoys qualified immunity from liability in his individual capacity.

### iii. Liability of the Municipality

 As a rule, local governments may not be sued under 42 U.S.C. § 1983 for an injury inflicted solely by employees or agents under a *respondeat superior* theory of liability. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018. A municipality can therefore be held liable when it unconstitutionally "implements or executes a policy statement, ordinance, regulation, or decision officially adopted by that body's officers." *Id.* at 690, 98 S.Ct. 2018. Whether a governmental official is vested with the authority to make official policy is a question of state law. *Jett v. Dallas Indepen-*

*dent School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). The trial judge's task is to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Id.* It is then for the jury to determine whether their decisions have caused a deprivation of rights. *Id.*

Municipalities that meet the requirements of Ohio Rev.Code § 1905.01 are authorized to convene mayor's courts. The statute does not, however, require a municipal corporation or its mayor to establish or maintain a mayor's court. *State ex rel. Boston Heights v. Petsche*, 27 Ohio App.3d 106, 499 N.E.2d 1250, syllabus ¶ 2 (1985). In *State ex rel. Boston Heights v. Petsche*, after holding court for almost one year, the Mayor of Boston Heights, Ohio announced his decision to shut down the mayor's court. *Petsche*, 27 Ohio App.3d at 106, 499 N.E.2d at 1250. In response, the village council passed an ordinance requiring the mayor to preside over the mayor's court and to exercise his statutorily conferred jurisdiction. After the Mayor steadfastly refused to hear any cases, the village brought a petition for a writ of mandamus to compel him to abide by the ordinance. The Court of Appeals of Ohio for Summit County denied the writ on grounds the state statute authorizing mayor's courts merely conferred jurisdiction and did not mandate mayor's courts. Also, because the exclusive power to create courts inferior to the Supreme Court of Ohio is vested in the General Assembly, the court concluded that villages "cannot create a mayor's court by local ordinance" and thereby force their mayors to hold mayor's court. *Id.*, 499 N.E.2d at 1251.

In this case, the Mayor of Macedonia is undeniably vested with the authority to make official policy regarding whether to hold and how to structure a mayor's court. Jurisdiction to hold mayor's court is con-

ferred upon the Mayor of Macedonia under Ohio Rev.Code § 1905.01. The City's charter confirms that "[t]he Mayor may *in his discretion* hold Mayor's Court, pursuant to the Statutes of the State of Ohio." Charter § 5.01 (emphasis added). Thus the mayor speaks with final policymaking authority for the City of Macedonia concerning the functioning of the Mayor's Court. Defendants contend that the City should not be liable for actions of the Mayor "[w]hile acting in his judicial capacity." Brief of Defendants–Appellees, at 20. Although the Mayor acted in his judicial capacity as a trier of fact and interpreter of existing law while presiding over plaintiff's trial, we do not agree that his judicial role encompassed the discretionary decision whether to operate a mayor's court and whether to appoint a magistrate to hear its cases. A mayor's decision whether to hold a mayor's court at all, and if so, whether to preside over it one's self, appoint a magistrate, or perhaps do both, are policy decisions addressing the administration of the municipality. We therefore hold that the City of Macedonia is not immune from liability for plaintiff's deprivation of due process.

### C. Failure of City to Provide Adequate Notice

■ Plaintiff contends that the district court erred in dismissing his claim that he was deprived of procedural due process because the parking citation he received contained no information as to how to contest the complaint, because he never received any other information, and that even if the City sent a subsequent summons by regular mail, that method of notice was inadequate to provide due process. *See* Brief of Plaintiff–Appellant at 40–43. The district court dismissed plaintiff's claim on grounds: (1) he articulated no "life, liberty or property" interest affected by Officer Nicholl's mere issuance of the traffic citation to him; and (2) before he was convicted of any offense, plaintiff appeared at trial and, after his conviction, "took advantage of post-deprivation

remedies afforded by the state by appealing to (and succeeding in having his convictions dismissed in) Cuyahoga Falls Municipal Court." Mem. Op. and Order of June 19, 1997, at 14–15, J.A. 146–47. Therefore "DePiero received a 'pre[deprivation] opportunity to respond, coupled with post[deprivation] ... procedures,' which were sufficient to satisfy due process." Mem. Op. and Order of June 19, 1997, at 15, J.A. 147 (citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547–48, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)).

In support of his procedural due process claim, plaintiff points to requirements under Ohio law which provide that citations must contain "[a]n order for the offender to appear at a stated time and place," Ohio Rev.Code § 2935.26(B)(4), and notice that the offender is required to do one of the following: "[a]ppear at the time and place stated in the citation," § 2935.26(B)(6)(a), or within seven days after the date of issuance of the citation,

(1) Appear in person at the office of the clerk of the court stated in the citation, sign a plea of guilty and a waiver of trial provision that is on the citation, and pay the total amount of the fine and costs;

(2) Sign the guilty plea and waiver of trial provision of the citation, and mail the citation and a check or money order for the total amount of the fine and costs to the office of the clerk of the court stated in the citation. Remittance by mail of the fine and costs to the office of the clerk of the court stated in the citation constitutes a guilty plea and waiver of trial whether or not the guilty plea and waiver of trial provision of the citation are signed by the defendant.

§ 2935.26(C)(1)-(2).

The parking ticket left on plaintiff's car contained none of the information required by statute. Plaintiff argues that the failure of the City to include information *in the ticket* about how to contest the citation resulted in deprivation of his liberty, i.e. his arrest for failure to appear. Before a

bench warrant was issued for his arrest, however, the City did mail him a summons to his last known address ordering him to appear in Mayor's Court on January 23, 1995 at 10:30 A.M. Plaintiff maintains he never actually received this notice and consequently did not appear in court.

■ Failure of the citation to comply with state law does not, however, automatically translate into a deprivation of procedural due process under the United States Constitution. To satisfy due process under the Constitution, notice must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and "must afford a reasonable time for those interested to make their appearance[.]" *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). In this case, although the plaintiff did not receive such notice in the ticket itself, nor did he receive it before the first hearing on the citation, he was thereafter mailed a summons on January 12, 1995, ordering him to appear in court on January 23, 1995. The summons also indicated that he would not be threatened with arrest unless he failed to appear on that date. As a result, he was not deprived of any liberty interest before his failure to appear at the second hearing on January 23, 1995.

Plaintiff claims notice by first class mail was insufficient to satisfy due process. In *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), the United States Supreme Court held that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party ... if its name and address are reasonably ascertainable." In that case, which involved a tax sale of mortgaged property, the Court held that when a "mortgagee is identified in a mortgage that is publicly recorded, constructive notice by publica-

tion must be supplemented by notice mailed to the mortgagee's last known available address, or by personal service." *Id.* at 798, 103 S.Ct. 2706; *see also Weigner v. City of New York*, 852 F.2d 646, 651–52 (2d Cir.1988) (notices of commencement of tax foreclosure action sent by first class mail pursuant to New York City's Administrative Code satisfied property owner's right to due process when supplemented by publication and posting). In the instant case, plaintiff received a ticket on his car calculated to notify him that traffic charges were pending against him. This was supplemented by notice by mail as to where and when he might contest the charges. The Fifth Circuit in *Armendariz–Mata v. U.S. Dept. of Justice* held that "[u]nder most circumstances, notice sent by ordinary mail is sufficient to discharge the government's due process obligations;" but when notice is by mail, the proper inquiry is "not simply whether the government sent the notice, but whether it acted reasonably under all the circumstances in relying on the mail as a means to apprise the interested party of the pending action." *Armendariz–Mata v. U.S. Dept. of Justice*, 82 F.3d 679, 683 (5th Cir.1996). In *Armendariz–Mata*, the Fifth Circuit held that the government's notice by mail of forfeiture proceedings to a federal prisoner's home and publication in USA Today were insufficient to satisfy due process because he was in jail. "Given the government's knowledge of Mata's whereabouts, the notice to Mata's home residence was not adequate to apprise Mata of the pendency of the forfeiture proceedings." *Id.* In this case, however, plaintiff was not incarcerated and the City had no information about plaintiff's whereabouts that would give reason to suspect he would not actually receive notice mailed to his last known address. *See also United States v. Rodgers*, 108 F.3d 1247, 1252–54 (10th Cir. 1997) (finding when notice mailed to one address was returned undelivered, the government should have tried another address at which it knew that the claimant received mail, stored property, and paid the utility bills). We are not persuaded

that the City acted unreasonably in sending notice by first class mail to plaintiff's home.[9]

Therefore we affirm the district court's dismissal of plaintiff's claim that he was deprived of procedural due process because the parking ticket left on his car failed to specify where and how to contest the complaint.

### D. Fourth Amendment Claim against Officer Nicholl for Initiating and Filing Citation without Probable Cause

 Plaintiff contends that the district court erred in dismissing Count V of his complaint, which alleged a claim under 42 U.S.C. § 1983 for damages against Officer Nicholl and the City for violating his rights under the Fourth Amendment by issuing a citation under Macedonia Codified Ordinance § 351.12 without probable cause. Under *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." The district court essentially held that, regardless of whether Officer Nicholl had probable cause to ticket plaintiff for a violation of § 351.12, he effected no "seizure" of plaintiff's person upon issuing the traffic ticket because there was no "face-to-face encounter." Plaintiff therefore could not have felt that he was "not free to walk away from Nicholl." Mem. Op. and Order of June 19, 1997, at 16–17, J.A. 148–49.

Plaintiff submits that the district court erred in dismissing his claim because the issuance of a summons alone, without any face-to-face encounter, may constitute a seizure of the person. Plaintiff relies upon Justice Ginsburg's concurrence in *Albright*

*v. Oliver*, 510 U.S. 266, 277–79, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and the decision of the Sixth Circuit in *Bacon v. Patera*, 772 F.2d 259, 265 (6th Cir.1985) for the proposition that a Fourth Amendment claim for initiating criminal charges without probable cause may be brought in a case where the police use a summons in lieu of an arrest. Both *Albright* and *Bacon* are distinguishable from plaintiff's own predicament. Each of the cited cases addressed a situation in which the plaintiff voluntarily responded to a summons or arrest warrant, answered to the charges against him, and was then released on bond in lieu of remaining incarcerated until trial. *See Albright*, 510 U.S. at 268, 279, 114 S.Ct. 807; *Bacon*, 772 F.2d at 262. Plaintiff cannot claim issuance of the traffic ticket effected a "seizure" because upon appearing to answer the charges in the ticket, he would have been afforded a trial. On the date he was issued the parking ticket, he was "free to leave." As a result, plaintiff has no § 1983 claim against Officer Nicholl for issuance of the ticket. It was not until he failed to appear for the hearing on the traffic citation that an arrest warrant or summons sufficient to constitute a "seizure" pursuant to *Bacon v. Patera* or Justice Ginsburg's concurrence in *Albright v. Oliver* would have been, and was in fact, issued. Officer Nicholl had no role in issuance of the bench warrant, so plaintiff cannot maintain a claim under § 1983 against him for such a seizure. Accordingly, we affirm the district court's dismissal of Count V of plaintiff's complaint.

### E. Pendent Malicious Prosecution Claim against

### Officer Nicholl

 Plaintiff appeals the district court's dismissal of his pendent malicious

---

9. Plaintiff also argues that the City at least should have sent notice by certified mail so that it would be aware via return-receipt whether plaintiff had actually received the mailing. As defendants point out, however, certified mail would not ensure plaintiff's receipt of the notice if, for example, a family member signed for the mailing and then failed to give it to him. *See Weigner*, 852 F.2d at 649 ("'the state's obligation to use notice 'reasonably certain to inform those affected' does not mean that all risk of non-receipt must be eliminated'").

prosecution claim against Officer Nicholl for lack of presence of a viable federal claim. A district court's dismissal of pendent state claims is reviewed for abuse of discretion. *Hankins v. The Gap, Inc.*, 84 F.3d 797, 802 (6th Cir.1996); *Landefeld v. Marion General Hospital, Inc.*, 994 F.2d 1178, 1182 (6th Cir.1993). *See also Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir.1998) ("[T]he exercise of supplemental jurisdiction is left to the discretion of the district court, and this court's review is limited to whether the district court abused its discretion.") (internal citations omitted).

The supplemental jurisdiction statute, 28 U.S.C. § 1367, confers upon district courts supplemental jurisdiction over all claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The statute also permits district courts, in their discretion, to dismiss pendent state law claims if all federal claims have been dismissed. 28 U.S.C. § 1367(c)(3).

Plaintiff has failed to show "how any substantial savings in judicial resources would be gained that outweigh the interest in avoiding the unnecessary resolution of state law issues," nor any "undue amount of wasted or duplicative effort that will result from having to re-file ... in state court." *Hankins*, 84 F.3d at 803. Moreover, plaintiff's request for reinstatement of his malicious prosecution claim is conditioned upon a decision by this court to reverse and remand his constitutional claims to the district court. Brief of Plaintiff–Appellant at 48. As we do not remand any of plaintiff's constitutional claims, we see no utility in sending back to the district court a single issue that turns upon

state law and which would be better resolved by the courts of the State of Ohio. Accordingly, we affirm the district court's dismissal of plaintiff's malicious prosecution claim. Because neither the district court nor this court has addressed the malicious prosecution claim on its merits, plaintiff may choose to re-file the claim in state court.[10]

## IV. CONCLUSION

Having carefully considered the record on appeal, the briefs of the parties, the arguments of counsel, and the applicable law, we **REVERSE** the district court's grant of summary judgment for the defendants and its denial of summary judgment for the plaintiff on the first two counts of plaintiff's complaint challenging the constitutionality of Ohio Rev.Code § 1905.01 and alleging that plaintiff was denied due process when Mayor Migliorini presided over adjudication and sentencing of his contested criminal case. We also **REVERSE** the district court's dismissal of Count III of the complaint as we hold that a due process violation occurred upon Mayor Migliorini's issuance of a bench warrant for plaintiff's arrest as a result of his failure to appear in Mayor's Court. We **AFFIRM** the district court's dismissal of plaintiff's remaining claims.

---

**10.** The statute of limitations for a malicious prosecution claim in Ohio is one year. Ohio Rev.Code § 2305.11(A). The statute of limitations is tolled, however, when a plaintiff files a malicious prosecution claim which ultimately fails otherwise than upon the merits. Ohio Rev.Code § 2305.19 provides that, "[i]n

an action commenced, or attempted to be commenced ... or if the plaintiff fails otherwise than upon the merits, and the time limited for the commencement of such action at the date of reversal or failure has expired, the plaintiff ... may commence a new action within one year after such date."